**CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Consolidated Edison Company of New York, Inc., Orange and Rockland Utilities, Inc., and Power Authority of the State of New York, Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

and

**Hudson River Fishermen's Association, Intervenor-Respondent.**

**CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Consolidated Edison Company of New York, Inc., Orange and Rockland Utilities, Inc., and Power Authority of the State of New York, Plaintiffs-Appellants,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Douglas M.**

**Costle, as Administrator, U. S. Environmental Protection Agency, Eckardt C. Beck, Regional Administrator, Region II, U. S. Environmental Protection Agency, New York State Department of Environmental Conservation, and Peter A. A. Berle, Commissioner, New York State Department of Environmental Conservation, Defendants-Appellees,**

and

**Hudson River Fishermen's Association, Intervenor-Defendant-Appellee.**

**Nos. 941, 942, Docket 77–4192, 78–6032.**

United States Court of Appeals, Second Circuit.

Argued May 1, 1978.

Decided Nov. 3, 1978.

G. S. Peter Bergen, New York City (Robert J. Glasser, Thomas E. Mark, LeBoeuf, Lamb, Leiby & MacRae, New York City, of counsel), for petitioners-appellants Central Hudson, et al.

Anne Sidamon-Eristoff, Asst. U. S. Atty., S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Patrick H. Barth, Louis G. Corsi, Asst. U. S. Attys., S. D. N. Y., New York City, Warren H. Llewellyn, U. S. Environmental Protection Agency, New York City, of counsel), for respondents-appellees EPA, Costle and Beck.

Albert K. Butzel, New York City (Clifford P. Case, III, Butzel & Kass, New York City, of counsel), for intervenor-respondent-appellee Hudson River Fishermen's Ass'n.

Before FEINBERG and MESKILL, Circuit Judges, and BRIEANT *, District Judge.

* Honorable Charles L. Brieant, Jr., of the Southern District of New York, sitting by designation.

MESKILL, Circuit Judge:

Three public utilities [1] and the Power Authority of the State of New York [2] engaged in the generation and sale of electricity in New York have brought suit against the United States Environmental Protection Agency ("EPA"), the New York State Department of Environmental Conservation ("DENCON") and officials of those bodies. The principal relief sought is a declaration that DENCON, rather than EPA, has jurisdiction over pending applications to discharge pollution into the Hudson River.[3] The United States District Court for the Southern District of New York, Robert L. Carter, *Judge*, dismissed the complaint for lack of subject matter jurisdiction on the ground that the Courts of Appeals have exclusive jurisdiction over the dispute. 444 F.Supp. 628 (S.D.N.Y.1978). By order of this Court, the appeal from the judgment entered in the district court has been consolidated with an original petition for review of a decision by the General Counsel of the EPA which determined that the EPA retained jurisdiction over the applications.[4] We hold that the district court had jurisdiction and that the EPA has jurisdiction over the applications.

FACTS

Petitioners-appellants ("the utilities") operate four steam-driven electric power generating plants at locations on the Hudson River.[5] This generation of power requires that heat be removed from the system. To accomplish this, each power plant uses a "once-through" cooling system in which water is pumped from the river, circulated through condensers in the plant, and then returned to the river at elevated temperatures. Heat is a pollutant under the Federal Water Pollution Control Act, 33 U.S.C. § 1362(6), and therefore the utilities must obtain and comply with the terms of a National Pollution Discharge Elimination System ("NPDES") permit issued pursuant to 33 U.S.C. § 1342.[6]

The Act provides that the Administrator of the EPA may issue a NPDES permit "after opportunity for public hearing." 33 U.S.C. § 1342(a)(1). In recognition of "the primary responsibilities and rights of States," 33 U.S.C. § 1251(b), the Act allows the States to assume control of the administration of the NPDES permit program, provided their own programs meet minimum federal standards. 33 U.S.C. § 1342(b). Once a State has taken over administration of the program, the Administrator of the EPA is directed to "suspend the issuance of permits." 33 U.S.C. § 1342(c)(1).

The utilities applied to the EPA for permits between 1971 and 1974. In accordance with EPA regulations, the regional staff of the EPA prepared "tentative determinations" with respect to each application and drafted proposed NPDES permits. 40 C.F.R. § 125.31. The public was notified of

1. Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., Orange and Rockland Utilities, Inc.

2. The Power Authority of the State of New York is a corporate municipal instrumentality and a political subdivision of the State; it was created by statute. Pub. Auth. Law § 1002.

3. Injunctive relief is also sought.

4. The Hudson River Fishermen's Association, an organization of commercial and sports fishermen interested in the preservation of the fisheries of the Hudson River, intervened in the district court action with the permission of the district court and in the original petition for review in this Court with the permission of this Court.

5. The power plants involved are the Roseton Generating Station and the Bowline Point Generating Station, which are oil-fired, and the Indian Point Units Numbered 2 and 3, which are nuclear facilities.

6. In *Appalachian Power Co. v. Train*, 545 F.2d 1351 (1976), the Fourth Circuit set aside the EPA's guideline regulations relating to thermal discharges from power plants such as those involved here. We are informed that, pending promulgation of new regulations, the Administrator is proceeding under the general authority of 33 U.S.C. § 1342(a) to issue a permit on such terms as are necessary to carry out the provisions of the Act. The permits involved here were based on the old regulations. We have no reason to believe that the promulgation of new regulations will require material changes in the terms of the permits.

these tentative determinations. 40 C.F.R. § 125.32. After further study, the Regional Administrator of the EPA made a final "determination" with respect to each application. 40 C.F.R. § 125.35(a). In February and July of 1975, the EPA circulated a "Notice of Issuance of Final Determination" with respect to each of the four power plants; annexed to each was a NPDES permit which the EPA "proposed" to issue. The Notice stated that "[t]he Final Determination will become a final NPDES permit, issued and effective [in thirty days as provided in 40 C.F.R. § 125.35(c) and (d)] unless an Adjudicatory Hearing is granted pursuant to 40 C.F.R. § 125.36 . . . ."

The permits which the EPA proposed to issue required, *inter alia*, that the thermal discharges now emanating from the power plants be reduced by ninety percent. The parties assume that under current technology this result can be achieved only by reducing the electricity generated or by erecting a closed-cycle cooling system, such as a natural draft wet cooling tower, which would transfer the heat from the cooling water to the air. Such towers were described by the Fourth Circuit Court of Appeals in *Appalachian Power Co. v. Train,* 545 F.2d 1351, 1357 (1976):

> Natural draft [wet] cooling towers are enormous concrete cylinders, which may be 350 to 550 feet in diameter and 300 to 600 feet tall. (The height is necessary to create the natural draft required to draw the air through the tower from bottom to top.) The bottom one-tenth of the tower is filled with slats and baffles to break up the water and expose a larger surface area to the air flow so as to increase evaporation. Warm water from the condenser is pumped to the top of the tower, there discharged, and cooled by moving air as it falls to the bottom. It is there collected and returned to the condenser.

(material in parentheses from *id.* at n.19). The physical appearance of these towers is now widely familiar as a result of a tragic construction accident in Willow Island, West Virginia. According to the utilities, these towers would involve a capital cost in excess of $350 million to build and annual costs in excess of $100 million. The operation of the towers would consume the energy equivalent of about 720,000 barrels of oil each year. The cost of compliance with the provisions of the EPA permit would eventually be visited upon the customers and users of electric power in New York State, because the Power Authority of the State of New York is required to be self-supporting by the statute that created it, N.Y. Pub. Auth. Law §§ 1005(5) & 1010(7), and the remaining utilities are entitled to earn a fair return based in part on the "fair value of the property of the corporation used and useful" in the public service, N.Y. Pub. Serv. Law §§ 66(16) & 72.

Each of the utilities filed timely requests for adjudicatory hearings before the EPA. 40 C.F.R. § 125.36. The provisions in the permits which the utilities wished to contest related primarily to the limitations on thermal discharges. The requests for hearings were granted, and notice of that fact was given to the public. 40 C.F.R. § 125.-36(c)(4).

At a formal prehearing conference between the EPA and the utilities in February of 1977, the utilities raised the question whether the EPA still had jurisdiction to hold the adjudicatory hearings in light of (1) the EPA's recent approval of New York State's program for the administration of the NPDES permit program, and (2) the command in the statute that after a State program is approved the EPA must "suspend the issuance of permits." 33 U.S.C. § 1342(c)(1). The utilities argued that DENCON had jurisdiction over their applications.

An understanding of the utilities' argument requires a familiarity with the provisions of the Water Pollution Control Act regarding the approval of State programs generally and the approval of New York's program in particular. States compete with each other for industry, and the availability of cheap electric power promotes industry in any locality where it can be had. Natural forces of competition between States may have tended in the past to di-

minish the ardor of State and local officials for the elimination of water and air pollution caused by the generation of electricity. This makes federal supervision appropriate and, at times, necessary. Nevertheless, it is part of our philosophy of government that the government closest to the people should act in matters of importance in their daily lives to the greatest extent possible, to the exclusion of the federal administrator. Congress was acutely aware of these delicate issues affecting our concept of federalism when, on October 18, 1972, it passed § 402(c)(1) of the Federal Water Pollution Control Act Amendments of 1972, Pub.L. No.92–500, 86 Stat. 882, *codified at* 33 U.S.C. § 1342(c)(1), which provides:

> Not later than ninety days after the date on which a State has submitted a program . . . the Administrator shall suspend the issuance of permits . . . unless he determines that the State permit program does not meet [legal requirements].

There can be no doubt that "[i]t is the policy of Congress that the States . . . implement the permit programs . . . ." Clean Water Act of 1977, Pub.L.No.95–217, § 26(b), 91 Stat. 1575, *amending* 33 U.S.C. § 1251(b).

New York submitted its permit program to the EPA for approval in 1974. The EPA approved the program effective October 29, 1975. 40 Fed.Reg. 54462 (Nov. 24, 1975). The notice in the Federal Register stated that New York's program was being administered in accordance with the provisions of a Memorandum of Agreement dated August 26, 1975, between the EPA and DENCON. The Memorandum provides that

> all adjudicatory hearings, hearings with respect to [33 U.S.C. § 1326 (thermal discharges)], citizen suits or other litigation concerning NPDES permits issued by the Regional Administrator prior to the date

upon which the Administrator approves the State's permit program will be defended by the Regional Administrator [of the EPA] . . . .

The EPA and DENCON have interpreted this language and their own regulations [7] to mean that "the EPA would retain jurisdiction over those cases in which adjudicatory hearings were pending at the time the state program went into force." 444 F.Supp. at 630. The utilities argue that a permit does not "issue" until *after* the adjudicatory hearing has been concluded. By retaining jurisdiction, they argue, the EPA is violating the Act by refusing to "suspend the issuance of permits."

As is required by 40 C.F.R. § 125.36(m), the jurisdictional dispute was referred to the EPA's Assistant Administrator for Enforcement and General Counsel, who, on July 29, 1977, rendered OGC Opinion Number 63, a Decision of the General Counsel on Matters of Law Pursuant to 40 C.F.R. § 125.36(m), which concluded that the EPA could retain jurisdiction over adjudicatory hearings without violating the statutory command to "suspend the issuance of permits" because the utilities' permits were already "issued" under the EPA's regulations.

The General Counsel's opinion was served on the utilities on August 11, 1977. On October 5, 1977, the complaint in this action was filed in district court, and on November 7, 1977, a petition for review of the General Counsel's opinion was filed in this Court under 33 U.S.C. § 1369(b)(1). The petition was apparently filed as a precaution because of uncertainty over whether § 1369(b)(1) deprived the district court of jurisdiction over this dispute. The petition was withdrawn by stipulation without prejudice to the filing of a supplemental petition as of November 7, after the conclusion of the action in district court.

---

7. The effect of the EPA's grant of the utilities' requests for adjudicatory hearings with respect to the contested provisions is fairly clear under the EPA's regulations. The uncontested provisions of the proposed permit are considered "issued and effective," and they are binding on the utilities; the effect of the contested provisions is stayed and the provisions are considered non-final for purposes of judicial review, pending the outcome of the adjudicatory hearings. 40 C.F.R. § 125.35(c) & (d). Apparently, the utilities are now operating under the authority of the permits.

The district court dismissed the complaint for want of subject matter jurisdiction. The court held that the dispute fell within the ambit of § 1369(b)(1)(F), which gives the Courts of Appeals exclusive jurisdiction over review of agency action "in issuing or denying any [NPDES] permit." In light of this determination, the district court declined to consider EPA's alternative contentions that exclusive jurisdiction lay in the Courts of Appeals by virtue of subsection (D), which deals with agency action "in making any determination as to a State permit program." The district court further declined to consider whether the dispute was ripe for judicial review or whether the EPA had "issued" a permit.

The district court's decision was rendered on February 10, 1978. The utilities filed their notice of appeal on February 17, and a supplemental petition for review was filed in this Court on February 21.

## JURISDICTION OF THE FEDERAL COURTS

First we must resolve the threshold question of which federal court, if any, has jurisdiction to resolve the underlying dispute over whether the EPA or DENCON can process the utilities' applications.

 The general grant of federal question jurisdiction found in 28 U.S.C. § 1331(a), *as amended,* Pub.L.No.94–574, 90 Stat. 2721 (1976), gives the district courts jurisdiction to review agency action. *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). This action "arises under the . . . laws . . . of the United States" because the basis for the utilities' cause of action is the EPA's

alleged violation of 33 U.S.C. § 1342(c)(1). The parties have not brought to our attention any preclusion-of-review statute which might bar such an action, nor are we aware of any. *Compare Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *see Leedom v. Kyne,* 358 U.S. 184, 190, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). No such evidence is present in this case. This case, of course, does not involve a "final" agency action. But the facts here are both compelling and unusual—this is one of the rare cases in which a district court appropriately "interrupts" agency action on the ground that the agency is acting outside its statutory authority. *Lone Star Cement Corporation v. F. T. C.,* 339 F.2d 505 (9th Cir. 1964); *see* concurring opinion of Judge Feinberg, *infra.* Accordingly, it would appear that the district court had jurisdiction to review EPA's decision to retain jurisdiction over the utilities' applications.

 The district court dismissed the complaint on the ground that the dispute lay within the exclusive jurisdiction of the Courts of Appeals. It is clear that if the agency action sought to be reviewed falls within one of the six categories described in 33 U.S.C. § 1369(b)(1),[8] the jurisdiction of the Courts of Appeals is exclusive. *See Sun Enterprises, Ltd. v. Train,* 532 F.2d 280, 287 (2d Cir. 1976). It is also clear, however, that the six categories of § 1369(b)(1) do not cover all possible forms of agency action:

---

**8.** The statute provides as follows:

Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316

of this title, and (F) in issuing or denying any permit under section 1342 of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.

the complexity and specificity of section [1369(b)(1)] in identifying what actions of EPA under the [Act] would be reviewable in the courts of appeals suggests that not all such actions are so reviewable. If Congress had so intended, it could have simply provided that all EPA action under the statute would be subject to review in the courts of appeals, rather than specifying particular actions and leaving out others. . . .

. . . [I]t seems to us that when a jurisdictional statute sets forth with such specificity the actions of an administrative agency which may be reviewed in the courts of appeals, a litigant seeking such review of an action that is not specified bears a particularly heavy burden.

*Bethlehem Steel Corp. v. EPA,* 538 F.2d 513, 517–18 (2d Cir. 1976). Section 1369(b)(1) arguably gives this Court exclusive jurisdiction over this dispute under subsection (D) or subsection (F).

Subsection (D) deals with "[r]eview of the Administrator's action . . . in making any determination as to a State permit program . . . ." In our view, it is fairly obvious that this provision was designed to give the Courts of Appeals exclusive jurisdiction over a dispute between a State or its citizens and the EPA over a decision by the EPA regarding the approval or disapproval of a State program. *See, e. g., EPA v. State Water Resources Control Board,* 426 U.S. 200, 210 & n.20, 96 S.Ct. 2022, 2027, 48 L.Ed.2d 578 (1976). We do not understand this section to apply to every dispute in which the EPA's approval or disapproval may be relevant: it is limited to situations where the approval or disapproval itself is being challenged. Here the utilities are not challenging the EPA's approval of New York's program; on the contrary, they are pleased that it has been approved. The challenge is to the EPA's decision with respect to its duty under § 1342(c)(1) to "suspend the issuance of permits." The EPA's approval of New York's program is relevant to that decision because it occasioned the need to make the

decision, but, in the absence of a challenge to the approval, subsection (D) does not dictate that review of the EPA decision to retain jurisdiction lies exclusively in the Courts of Appeals.

Subsection (F) deals with "[r]eview of the Administrator's action . . . in issuing or denying any [NPDES] permit . . . ." The district judge held that the utilities' complaint came within this subsection. He reasoned that, after the administrative process has run its full course, the Courts of Appeals would have exclusive jurisdiction to review the EPA's decision to issue or deny the permits. "[J]udicial review of an administrative 'action,'" the judge explained, "encompasses review of the actor's jurisdiction to take the action as well as review of the correctness of the substance of the action." 444 F.Supp. at 631 n.12. Thus, he concluded, the exclusive jurisdiction of the Courts of Appeals encompassed review of the EPA's decision to retain jurisdiction. This was necessary, the judge said, in order to avoid a wasteful system of "bifurcated" review under which the district courts and the Courts of Appeals would have jurisdiction to review the same issue. 444 F.Supp. at 632.

We believe that the district judge was overly cautious in an apparent effort to avoid encroaching upon the jurisdiction of this Court. Although we agree that once the EPA's action has run its full course we would have jurisdiction to review the EPA's decision to retain jurisdiction as well as to review the merits, we do not agree that our jurisdiction over the former is at all times exclusive.

If an administrative agency conducts proceedings over which it lacks jurisdiction, and the courts ultimately declare the proceedings a nullity, then the loss of time and expense to both the government and the defending party can be substantial. Thus, it may be desirable, at least where the proceedings are expected to be lengthy and the jurisdictional dispute is substantial, to have some form of judicial review of the jurisdictional issue at an early stage of the proceedings. However, if the Courts of Ap-

peals have exclusive jurisdiction over the jurisdictional issue, and if the jurisdiction of the Courts of Appeals depends on the final decision by the agency to "issue or deny" a permit, then no review would be possible at a stage when a judicial decision could obviate waste and delay.

The benefits which result from a system in which issues of law are resolved first by a district court and then by the Courts of Appeals are well known—particularly to the judges on the Courts of Appeals. Whether or not the Court of Appeals agrees with a decision rendered by a district court in any given case, it is invariably true that the primary review of the case by the lower court is of invaluable assistance. Thus, we are not inclined to favor an expansive construction of our own exclusive jurisdiction, because to do so would deprive us of the wisdom and sound judgment which district judges apply to questions we are eventually called upon to review. It is reasonable to assume that Congress intended us to have the help we need.

■ Finally, we do not regard the prospect of "bifurcated" review as a significant problem. Subsection (F) makes it clear that when the EPA has made its final decision to "issue or deny" a permit, the Courts of Appeals are vested with exclusive jurisdiction over the dispute, including that element of the dispute that relates to the EPA's jurisdiction to make the decision it made. Subsection (F) is obviously geared for very speedy resolution of disputes concerning a variety of EPA determinations. The short 90-day period in which to seek review accords with numerous other stringent deadlines in the Act intended to expedite the cleanup of the nation's waters. *See generally* section 101 of the FWPCA. The fact that judicial review of the actions covered by § 1369(b)(1) is in the Court of Appeals in the first instance evidences a purpose, *inter alia,* to save procedural steps and time.[9] After the EPA has completed its administrative proceeding and either de-

nied or issued a permit, to allow challenges to its jurisdiction then to be heard first in the district court would merely cause duplication and delay. Thus, when there is Court of Appeals jurisdiction to determine the merits of an EPA action regarding a permit, including the question of EPA's jurisdiction, district court jurisdiction no longer exists.

■ We hold that our exclusive jurisdiction under subsection (F) is limited to a direct challenge to the merits of a decision to "issue or deny" a NPDES permit. Although our actual review of such agency action may encompass that agency's jurisdiction to take the challenged action, we do not regard our jurisdiction to resolve such an issue as being at all times exclusive.

To summarize, because the utilities' complaint in this case did not challenge the EPA's decision to approve New York's permit program or the EPA's decision to issue the permits, but challenged instead the EPA's decision to retain jurisdiction over their permit applications, neither subsection (D) nor subsection (F) applies, and this Court does not have exclusive jurisdiction under § 1369(b)(1). For the same reason, we do not have original jurisdiction over the petition for review brought pursuant to that statute. Accordingly, the petition must be dismissed, and the judgment of the district court must be reversed.

■ Ordinarily, our decision to reverse the district court's decision to dismiss the complaint would require us to remand the case without passing on issues which the district court did not reach, for that is the "better practice." *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 156, 87 S.Ct. 1507. However, under 28 U.S.C. § 2106, this Court has broad power to make any disposition that is "just under the circumstances." *See generally Hormel v. Helvering,* 312 U.S. 552, 556–59, 61 S.Ct. 719, 85 L.Ed. 1037 (1941). The only issue involved in this case is one of law; there are no

---

**9.** *See* Note, Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals, 88 Harv.L.Rev. 980, 983 (1975).

genuine issues of material fact. Both sides moved for summary judgment in the district court, and the issue has been fully briefed and argued both here and in the district court. As explained below, delay may affect not only the parties, but may also have a significant adverse impact on the public interest. Accordingly, it is just under the circumstances for this Court to consider issues not reached by the district court.

RIPENESS

The first issue that was not reached by the district court and which must be confronted by this Court is whether the EPA's decision to retain jurisdiction over the utilities' pending applications is ripe for judicial review at this stage of the proceedings. In *Abbott Laboratories v. Gardner, supra,* Justice Harlan explained that the

> basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

387 U.S. at 148–49, 87 S.Ct. at 1515. The Court went on to say that the issue in that case was fit for judicial decision because it was a purely legal one involving congressional intent, rather than one involving factual determinations—both sides had moved for summary judgment, and no further administrative proceedings were contemplated. The issue was also fit for judicial decision because the agency action was "final agency action" within the meaning of § 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704 ("APA")—a requirement that the Court said was to be interpreted in "a pragmatic way." 387 U.S. at 149, 87 S.Ct. 1507. With respect to the

potential hardship to the parties, the Court found that "the impact of the [agency action] upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." 387 U.S. at 152, 87 S.Ct. at 1517. This was so, the Court explained, because the agency action required an immediate choice between costly compliance or serious criminal and civil sanctions. 387 U.S. at 152–54, 87 S.Ct. 1507. Finally, the Court noted that judicial review in that case would be more likely to speed than to delay enforcement of the Federal Food, Drug, and Cosmetic Act, which the challenged agency action was designed to implement. 387 U.S. at 154–56, 87 S.Ct. 1507.

An application of these principles here demonstrates that the ripeness doctrine does not bar immediate judicial review. The issue presented in this case is a narrow legal one involving an interpretation of Congress' command that the EPA "suspend the issuance of permits." 33 U.S.C. § 1342(c)(1). No factual determinations or matters within the expertise of an administrative agency are involved. Both sides have recognized this by cross-moving for summary judgment in the district court.

■ The agency action being challenged here is also "final agency action" within the meaning of § 10(c) of the APA. The challenged agency action is embodied in the General Counsel's decision. The EPA regulation pursuant to which that decision was made specifically provides:

> The decision of the Assistant Administrator for Enforcement and General Counsel *shall be final* with respect to each referred issue of law as it relates to the particular permit in question and shall be relied upon by the Regional Administrator in rendering the initial decision.

40 C.F.R. § 125.36(m)(4) (emphasis added). The regulations do appear to allow for some limited administrative review of the General Counsel's decision. After the adjudicatory hearings are concluded, on review of the initial decision of the Regional Administrator of the EPA, the decision of General Counsel can be upset if it was "clearly

erroneous" or if it involved an important policy question which the Administrator, "in his discretion," decides to review. 40 C.F.R. § 125.36(m)(3). As we explained above, however, the issue here is a purely legal one and does not involve a question of policy to be resolved in the exercise of the Administrator's discretion. Furthermore, the EPA's vigorous defense of the General Counsel's decision shows that the prospect that it will be upset by the Administrator on the ground that it was clearly erroneous is not a realistic possibility. Given the "pragmatic" approach favored by the Supreme Court in *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 149, 87 S.Ct. 1507, the finality of the agency's action is not open to serious doubt.

In this Circuit, the "hardship" determination required by *Abbott Laboratories v. Gardner, supra,* appears to have become closely associated with the question whether the challenged agency action is one "for which there is no other adequate remedy in a court" under § 10(c) of the APA, 5 U.S.C. § 704. *See Pepsico, Inc. v. FTC,* 472 F.2d 179, 185–86 & n.7 (2d Cir. 1972), *cert. denied,* 414 U.S. 876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973). *See also Association of National Advertisers, Inc. v. FTC,* 565 F.2d 237, 239 (2d Cir. 1977); *Natural Resources Defense Council v. Nuclear Regulatory Commission,* 539 F.2d 824, 836–38 (2d Cir. 1976), *vacated on other grounds sub nom. Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 434 U.S. 1030, 98 S.Ct. 1600, 54 L.Ed.2d 777 (1978); *Niagara Mohawk Power Corp. v. FPC,* 538 F.2d 966, 970 (2d Cir. 1976); *National Ornament & Electric Light Christmas Association v. Consumer Product Safety Commission,* 526 F.2d 1368, 1372–73 (2d Cir. 1975); *Sterling Drug, Inc. v. Weinberger,* 509 F.2d 1236, 1239 (2d Cir. 1975); *Ecology Action v. Atomic Energy Commission,* 492 F.2d 998, 1000–02 (2d Cir. 1974). The same thing has happened in other Circuits. *See e. g., Fort Sumter Tours, Inc. v. Andrus,* 564 F.2d 1119, 1123–24 (4th Cir. 1977); *New York Stock Exchange v. Bloom,* 562 F.2d 736, 740–43 (D.C. Cir. 1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978). This is not surprising, for the adequacy of judicial review after the agency proceedings have concluded necessarily depends on the extent of the hardship that will result if immediate review is denied.

One type of hardship that is often claimed in order to justify immediate review is the type involved in *Abbott Laboratories v. Gardner, supra,* where the challenging party is faced with a Hobson's choice between costly compliance with new regulations or serious sanctions for noncompliance. Another type is the type involved here, where the challenging party argues that the agency is acting without jurisdiction or in violation of a specific limitation on its power. *See McCulloch v. Sociedad Nacional,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1962); *Leedom v. Kyne, supra,* 358 U.S. at 184, 79 S.Ct. 180. *See also Gardner v. Toilet Goods Association,* 387 U.S. 167, 176, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967) (Fortas, *J.,* concurring and dissenting); *Coca-Cola Co. v. FTC,* 475 F.2d 299, 303 (5th Cir.), *cert. denied,* 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973). In such cases, the hardship arises in part because the challenging party is being required to defend a proceeding that may later be declared a nullity. Standing alone, however, this is not enough to justify immediate review. It is well-established that the mere trouble and expense of defending an administrative proceeding is insufficient to warrant judicial review of the agency's action prior to the conclusion of the administrative proceeding. *See Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–52, 58 S.Ct. 459, 82 L.Ed. 638 (1938). Other factors must be present in addition to this injury before judicial review will be considered appropriate. Such other factors may include the implications of the agency action on important public interests, *e. g., McCulloch v. Sociedad Nacional, supra,* 372 U.S. at 17, 83 S.Ct. 671, the impact of the action on the industry involved, *e. g., Natural Resources Defense Council v. Nuclear Regulatory Commission, supra,* 539 F.2d at 837, the disruptive effect of a subsequent declaration that prior proceedings were defective

or void and that new proceedings must be held, *e. g., Harlem Valley Transportation Association v. Stafford,* 500 F.2d 328, 335 (2d Cir. 1974); *cf. American Communications Association v. United States,* 298 F.2d 648, 650 (2d Cir. 1962), the duplication and waste of putting off a decision which must inevitably be made by the courts, *e. g., Bristol-Myers Co. v. FTC,* 469 F.2d 1116, 1119 (2d Cir. 1972) (Mansfield, *J.,* concurring), and the extent of the waste of governmental resources, *Pepsico, Inc. v. FTC, supra,* 472 F.2d at 187.

█ In this case, more is at stake than the mere trouble and expense to which the utilities will be put as a result of defending an adjudicatory hearing that may be a nullity. The parties are operating under a congressionally imposed deadline. Assuming, as is likely, that the EPA can revise its guideline regulations for thermal pollution in light of *Appalachian Power Co. v. Train, supra,* 545 F.2d 1351,[10] by July 1, 1981, the statute provides that the guidelines must be met by July 1, 1984. 33 U.S.C. § 1311(b)(2)(F). If this deadline is to be met, all adjudicatory hearings and administrative and judicial review must be concluded sufficiently in advance of the deadline to allow time for the construction of any cooling towers that may be necessary. If the utilities are required to wait until the conclusion of the EPA proceedings, which are expected to take several years, only to have this Court hold that the EPA lacked jurisdiction and that new proceedings must be conducted before DENCON, the likelihood that the deadline would be met would be reduced significantly. The public interest in avoiding the enormous waste of resources that would result if the EPA's proceedings are declared to be a nullity, the public interest in compliance with Congress' deadline, and the probability that this Court will inevitably have to resolve the issue presented all suggest that immediate judicial review is appropriate. The EPA argues that the utilities needn't be overly concerned with their ability to comply with the deadline because a good faith effort to comply "could be taken into account in any EPA enforcement action." Brief at 39. Even in the unlikely event that the utilities found any comfort in that assurance, we would still find it unpersuasive, for it appears to have been offered solely for the purpose of thwarting the utilities' attempt at judicial review, without regard to the public interest embodied in the deadline. After all, the permit provisions to which the utilities object are stayed pending the Administrator's final decision, and therefore the utilities will continue to discharge pollution at present levels until this matter is resolved and pollution control devices can be installed. Accordingly, we hold that the circumstances of this case make immediate judicial review appropriate.

## SUSPENSION OF THE FEDERAL PERMIT PROGRAM

We now address the other issue, not reached by the district court but which must be decided here, namely, whether the EPA or DENCON has jurisdiction over the utilities' pending applications. Under 33 U.S.C. § 1342(c)(1), when a State permit program is approved by the EPA, the EPA must "suspend the issuance of permits" so that the State can take over. Under the EPA's regulations, the utilities' permits are now issued and effective, and the utilities are subject to all of the uncontested provisions of the permits. 40 C.F.R. § 125.35(c) & (d). The effect of the contested provisions of the permits has been stayed pending final agency action. 40 C.F.R. § 125.-35(d)(2). Because the permits have issued, the EPA believes that it may handle any adjudicatory hearings or other litigation concerning the contested provisions without violating Congress' command that the EPA "suspend the issuance of permits." The principal issue before us, therefore, is whether the EPA's construction of the term "issuance" in § 1342(c)(1) is "sufficiently reasonable to preclude the [federal courts] from substituting [their] judgment for that of the Agency." *Train v. Natural Resources Defense Council,* 421 U.S. 60, 87, 95

---

10. *See* note 6, *supra.*

S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975), *quoted in E. I. duPont de Nemours & Co. v. Train,* 430 U.S. 112, 134–35, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

The EPA argues that its interpretation is reasonable because it "allows for the smooth transition from federal to state permit program." Brief at 30. A "[s]udden transfer . . . could significantly disrupt the State program," we are told, because DENCON is not prepared to bear the additional responsibilities that the hearings would entail. *Id.* & n.**. Inasmuch as the EPA is familiar with the permits and is prepared for the hearings, and DENCON is not, a sudden transfer could result in waste, duplication and delay. *Id.* at 30–31. The EPA points out that, in view of Congress' obvious concern for the prompt enforcement of the Act—evidenced primarily by its enactment of deadlines for compliance, 33 U.S.C. § 1311(b)—we should not lightly discard an efficient transitional program agreed upon by both State and Federal authorities. We find these arguments highly persuasive.

The EPA's interpretation is challenged by the utilities on two grounds. The first is based on 33 U.S.C. § 1342(a)(1), which provides that "the Administrator may, after opportunity for public hearing, issue a permit . . . ." The utilities argue that the hearing to which the statute refers is the adjudicatory hearing. Because the adjudicatory hearing has not been concluded, it is argued, the EPA lacks the authority to issue a permit. Because no permit has lawfully issued, the reasoning continues, further proceedings before the EPA necessarily contemplate issuance of the permits by the EPA at the conclusion of the hearings. Because future issuance would violate Congress' command to "suspend the issuance of permits," the utilities maintain that the EPA's interpretation must be inconsistent with the statute.

We find this argument unpersuasive. Under the EPA's interpretation, the utilities' permits have issued only to the extent that they have been uncontested. To the extent that they have been issued, there-fore, a full opportunity for hearing has been afforded, and no hearing has been sought. The purpose of § 1342(a)(1) is not to postpone the issuance of uncontested portions of a NPDES permit, it is to afford interested parties an opportunity to challenge permit provisions which might adversely affect them. The EPA's interpretation—under which uncontested provisions become part of an issued permit and contested provisions are stayed—does not conflict with the purpose of the statute, because the permits, as issued, consist solely of provisions to which no one has any objection.

The second ground on which the EPA's interpretation is challenged is based on the general statement of policy found in 33 U.S.C. § 1251(b), which provides:

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . .. It is the policy of Congress that the States . . . implement the permit programs . . . ..

So strong was Congress' intent to put the States in control of the permit programs, we are told, that § 1342(c)(1) must be interpreted in such a way as to require

EPA to "suspend"—to terminate—its administrative processes of issuing permits, without regard to where an individual permit may be in the issuing process, because, in order to achieve the policy that States administer the permit program, Congress deliberately provided that all remaining steps must be completed by the state.

Brief at 25–26. In other words, the utilities argue that Congress decided that the potential for inefficiency would be preferable to continued administration by the EPA. The flaw in this argument is that it attributes undue significance to a single congressional policy and in so doing ignores the overall purpose of the Act. The "objective" of the Act, as stated in the first sentence of the first section, "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). In

subsection (b) of § 1251, Congress states one of several "policies" in connection with the attainment of this "objective." Seen in its proper perspective, therefore, State implementation of the permit programs is merely the means which Congress prefers to use in order to attain a specific end, *i. e.,* unpolluted water. Thus, the issue is not *whether* to effectuate the policy of State implementation, it is rather *how* best to effectuate it without sacrificing the prompt and efficient accomplishment of the Act's overall objective. While the utilities are correct in arguing that the EPA's interpretation sacrifices the policy of State implementation, they cannot avoid the fact that their own interpretation produces duplication, waste and delay, all of which undermine the Act's objective. In our judgment, the EPA's interpretation is simply the more reasonable of the two. Accordingly, it will be upheld.

The petition for review is dismissed, the judgment of the district court is reversed, and the cause is remanded with instructions to enter summary judgment in favor of the defendants-appellees.[11]

FEINBERG, Circuit Judge (concurring):

Judge Meskill's opinion concludes that the district court had jurisdiction in this case and, on the merits, holds that the United States Environmental Protection Agency (EPA), not the New York State Department of Environmental Conservation (DENCON), has jurisdiction over petitioners' pending applications to discharge pollutants into the Hudson River. I concur in this result. EPA does make a strong argument that the utilities' attack on the continuing exercise of its jurisdiction is really a belated challenge to a "determination as to a State permit program" within the meaning of section 509(b)(1)(D) of the Federal Water Pollution Control Act (FWPCA), and hence cognizable exclusively in the courts of appeals.[1] Nevertheless, on these unusual facts, I have no real quarrel with holding

that the utilities are simply challenging EPA's jurisdiction over their particular applications rather than attacking the terms of EPA's approval of the State permit program. In this case, where the State permit program plan provides for the EPA jurisdiction exercised here, the distinction is a purely semantic one. Either characterization is reasonable. If we accept the one offered by EPA, along with the corollary that section 509(b)(1)(D) provides the exclusive route here for judicial review, the utilities' lawsuit would be time-barred because it was not brought within that section's 90-day time period. This would leave undecided important jurisdictional issues, surely an unfortunate result.

I agree with Judge Meskill that the district court had jurisdiction to decide whether EPA could properly exercise jurisdiction in this case. The reason I file this concurring opinion is to emphasize the narrowness of district court power to review, under 28 U.S.C. § 1331(a), the exercise of agency jurisdiction prior to a final order. It is true, as Judge Meskill states, that there is a strong presumption that Congress intended there to be judicial review of agency actions. See *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), pointing to congressional expansion of section 1331(a) jurisdiction by eliminating the jurisdictional amount requirement in suits brought against federal agencies. See also *Bethlehem Steel Corp. v. EPA,* 538 F.2d 513, 517 n.10 (2d Cir. 1976). However, that broad presumption applies only to specific final agency determinations on the merits.

Here the issue is interruption of agency action by a district court at an intermediate stage on the ground that the agency is acting beyond its statutory authority. In this situation, "the long settled rule" is that review of agency jurisdiction must await exhaustion of agency proceedings when the agency determination on the merits will also be subject to review. See *Myers v.*

---

11. Declaratory relief is all that is warranted under present circumstances.

1. The question of which court is the proper one in which to seek review of EPA actions is an

extraordinarily complex one. See Currie, Judicial Review Under Federal Pollution Laws, 62 Ia.L.Rev. 1221 (1977), urging congressional reform.

*Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). The policy of refraining from premature interference with the administrative means by which Congress sought to solve the problem of water pollution was not implicated by the problem posed in *Bethlehem Steel Corp. v. EPA, supra.* While the *Myers* principle has not been applied as rigidly as language in that case might suggest, see *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) (allowing district court review of NLRB action taken in direct contravention of statutory limitations, prior to completion of agency proceedings); 3 Davis, Administrative Law Treatise §§ 20.02, 20.03, at 57–74 (1958), the exception to the policy of exhaustion has been characterized as "limited." *McCulloch v. Sociedad Nacional,* 372 U.S. 10, 16, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963). See also *Herald Company v. Vincent,* 392 F.2d 354, 356–57 (2d Cir. 1968).

Professor Davis suggests that there are three key factors in determining whether there should be preliminary district court review of agency jurisdiction: "extent of injury from pursuit of administrative remedy, degree of apparent clarity or doubt about administrative jurisdiction, and involvement of specialized administrative understanding in the question of jurisdiction." 3 Davis, Administrative Law Treatise § 20.03 at 69 (1958). This tripartite test has been adopted by the Ninth Circuit, *Lone Star Cement Corporation v. F. T. C.,* 339 F.2d 505 (1964) and elsewhere, see cases cited in Davis, Administrative Law Treatise § 20.03, at 653 (Supp.1970), and is met in this case. With regard to the first factor, Judge Meskill properly emphasizes the difficulty in meeting the congressionally imposed deadline, if EPA's adjudicatory hearing is ultimately declared a nullity. He further points out the potential prejudice to the public interest in expeditious cleanup of the nation's waters if implementation of conservation measures must await a new

round of proceedings by DENCON. As for the third factor, the validity of EPA jurisdiction in this case turns solely on a question of statutory construction, whether or not the transitional terms of the State permit program violate section 402(c)(1) of the FWPCA. There is no reason to believe that this type of question, traditionally the province of the judiciary, in any way turns here on "specialized administrative understanding." The second factor's application here is less clear. While it is apparent to two of us that EPA, not DENCON, has jurisdiction, Judge Brieant is in disagreement. Nonetheless, given the hardship to the utilities, the potential damage to the public interest in a clean environment, and the undesirability of leaving undecided the important issue of whether EPA or DENCON has jurisdiction over all the adjudicatory hearings pending on October 29, 1975, the factor of lack of clarity on the jurisdiction of EPA loses significance. Hence, I agree that there is district court jurisdiction to review EPA's exercise of jurisdiction in the ongoing administrative proceeding.

I also agree with Judge Meskill's disposition on the merits rejecting the utilities' claim and upholding EPA jurisdiction in this case. Congress simply could not have intended the wasteful and awkward transition that the utilities believe is required here. See generally section 101(f) of the FWPCA, declaring one purpose to be the avoidance of duplication and delay at all levels of government.

BRIEANT, District Judge (concurring, and dissenting in part):

I am in complete agreement with Judge Meskill's fine opinion to the extent it decides that the district court had subject matter jurisdiction, and this Court does not have exclusive original jurisdiction, but appellate jurisdiction only. I also agree that the dispute is ripe for judicial review.[1]

---

1. I also agree with the principle set forth in Judge Feinberg's concurring opinion, implicit also in the majority opinion: only in a rare case is interruption of agency action by a district court appropriate on the ground that the agen-

cy is acting beyond its statutory authority. Judge Feinberg also perceives the instant case to be such a case where interruption is proper, and I concur.

I respectfully dissent from the majority's position on the merits, which seems simply to be that Congress was unwise in enactment of 33 U.S.C. § 1342(c)(1), which requires the cessation of EPA's permit issuing function 90 days after a state permit program has been approved. The majority's reasoning is purely pragmatic. It holds "while the utilities are correct in arguing that the EPA's interpretation sacrifices the [Congressional] policy of state implementation, they cannot avoid the fact that their own interpretation produces duplication, waste and delay, all of which undermine the Act's objective. In our judgment the EPA's interpretation is simply the more reasonable of the two." To the same effect is the statement in the concurring opinion that "Congress simply could not have intended the wasteful and awkward transition that the utilities believed is required here."

The EPA's interpretation here, accepted by the majority, may provide a reasonable and expeditious way of proceeding. It may avoid possible problems of duplication and delay, which, to me, seem avoidable. Not even arguably can this result be said to reflect the plain meaning of the language of the statute, nor the expressed intention of Congress in enacting the Federal Water Pollution Control Act Amendments of 1972. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

After determining that continued EPA administration would be more efficient, and serve the public interest, the majority phrases the issue here as "whether the EPA's construction of the term 'issuance' in § 1342(c)(1) is 'sufficiently reasonable to preclude the [federal court] from substituting [its] judgment for that of the Agency'," quoting *Train v. Natural Resources Def. Council,* 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975) and *E. I. duPont de*

*Nemours & Co. v. Train,* 430 U.S. 112, 134–35, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). In both of those cases, however, the issue was whether an agency interpretation, reasonably flowing from and arguably included within the scope of the statute and its legislative history, was sufficiently reasonable to preclude the courts from substituting their own judgment as to its correctness for that of the agency. Of course an agency's interpretation of its own statutory authority, especially where that statutory base is as complex as present here, is entitled to great weight in the courts. In this case, however, the majority goes considerably beyond an application of this truism, and, acting contrary to the relevant legislative history, reaches a result based solely on the perceived convenience of the results obtained.

Under EPA Regulations, a permit is "issued" by the Administrator when that official, after allowing an opportunity for a public ("town meeting") hearing, makes his "Final Determination." 40 C.F.R. § 125.35. The majority emphasizes the fact that all *uncontested* provisions of permits attached to such Final Determinations are enforceable, and completely "issued" from the date of the Administrator's determination. I am in complete agreement with that proposition. The problem here, however, arises from the *contested* provisions of the permits. EPA Regulations provide that if a party requests an adjudicatory hearing, the effect of contested provisions is stayed pending final agency action. 40 C.F.R. § 125.35(d)(2). Despite the absence of an adjudicatory hearing, the Regulations consider such contested provisions to have been "issued" from the date of the Administrator's determination.

These Regulations were promulgated by EPA in July 1974, *see* 39 Fed.Reg. 27078, *et seq.* (July 24, 1974), considerably before judicial decisions [2] extended the protection of the Administrative Procedure Act to pro-

---

**2.** *See Seacoast Anti-Pollution League v. Costle,* 572 F.2d 872 (1st Cir. 1978); *United States Steel Corp. v. Train,* 556 F.2d 822 (7th Cir.

1977); *Marathon Oil Co. v. EPA,* 564 F.2d 1253 (9th Cir. 1977).

ceedings under § 402(a)(1) of the Act, 33 U.S.C. § 1342(a)(1), which authorized issuance of NPDES permits. The Regulations are thus initially based on a misconstruction of their statutory foundations. The contested provisions of NPDES permits may not now be "issued" without an adjudicatory hearing on the record, and such a hearing has not yet been held in this case. The Preamble to the very Regulations relied on here by EPA recognizes this fact:

> "If a request for an adjudicatory hearing is granted . . . the provisions in the proposed permit that are contested *shall not be issued* and shall not be [final for purposes of review]." 39 Fed.Reg. 27078 (July 24, 1974) (emphasis added).

Thus, it is clear that the contested provisions of these permits have never been "issued" for purposes of § 402(a)(1) of the Act. Agency interpretations to the contrary fly in the face of the statute. It is clear, moreover, that Congress intended the word "issue" or its variants to have the same meaning in § 402(c)(1) and § 509(b)(1)(F) as it does in § 402(a)(1), namely, with regard to contested provisions of NPDES permits, "issuance" would occur upon promulgation of the permits after the full panoply of an adjudicatory hearing on the record. Until that point is reached, the Administrator, once having approved a state's application, must surrender control to the state within ninety days thereafter. The statute says he *"shall* suspend the issuance of permits" under the Act. 33 U.S.C. § 1342(c)(1) (emphasis added).

"[W]hen words of familiar usage are used in a statute they should be understood in their ordinary sense." *S. & S. Realty Corp. v. Kleer-Vu Industries, Inc.,* 575 F.2d 1040 (2d Cir. 1978). The majority's interpretation of the statute offends against this fundamental rule, and also imputes to Congress the unlikely intention of defining "issue" and its variants when used with respect to permits, differently in different sections of the same Act.

When, as here, a statute is plain and unambiguous on its face, resort to legislative history is uncalled for. *See Ex parte*

*Collett,* 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949). However, the legislative history of the Federal Water Pollution Control Act Amendments of 1972 makes it absolutely clear that Congress intended the result contended for by the Utilities. The Act itself states that

> "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . . It is the policy of the Congress that the States . . . implement the permit programs under sections 1342 and 1344 of this title." 33 U.S.C. § 1251(b) (1977).

It is thus clear, despite the majority's assertions to the contrary, that Congress has not only determined the goal to be achieved by the Amendments of 1972, but also specified the best *means* to effectuate that goal, namely, the prompt organization and administration of control programs on the state level, and prompt transfer of power. Congress intended that the states "be given maximum responsibility for the permit system and [that] the EPA's review authority be restricted as much as [is] consistent with its overall responsibility for assuring attainment of national goals." *EPA v. California,* 426 U.S. 200, 224–25, 96 S.Ct. 2022, 2043, 48 L.Ed.2d 578 n. 39 (1976).

The legislative history confirms that Congress intended EPA, once it approved the permit program of the individual state, should cease forthwith its own issuance of permits under the federal program. The House Report, for example, states:

> "Subsection [402] (c)(1) provides that not later than 90 days after the date on which a State has submitted a program pursuant to subsection (b), the Administrator *shall suspend the Federal permit program authorized under subsection [402] (a),* unless he finds the proposed State program does not satisfy the requirements issued under 304(h)(2)." A History of the Federal Water Pollution Control Act Amendments of 1972, vol. 2, at 814 (emphasis added).

The Senate Report is equally clear:

> "[A]fter a State submits a program which meets the criteria established by the Ad-

ministrator pursuant to regulations, the Administrator *shall suspend his activity in such State under the federal permit program.*" *Id.* at 1489 (emphasis added).

Congressman Roe reiterated the same consensus when he stated on the floor that "[n]ot later than 90 days after receiving the submittal *the State would take over the program* unless the Administrator found it did not satisfy the requirements." *Id.,* vol. 1, at 428. And finally, the legislative history makes it clear that this transfer of power to the states was not to be *piecemeal* or at the discretion of the Administrator, as urged by EPA here. This was recognized by EPA's own General Counsel in OGC No. 63, at 10–11:

> "I am not unmindful of various statements in the legislative history of the FWPCA indicating that Congress did not intend for the Administrator to delegate to the States 'bits, pieces, categories or other parts' of a permit program." 2 Leg. Hist. at 261.

All of this does not deny the continuing role of EPA in effectuating national policies. The statutory scheme does contemplate some division of responsibility between state and federal authorities for the administration of the Act. The states, for example, are under no compulsion to choose to administer their own programs, and EPA has the authority to withdraw approval of a state program in the event it is not administered "in accordance with the requirements" of the Act. 33 U.S.C. § 1342(c)(3). There is thus nothing untoward in the fact that, if we were to hold that EPA lacked the authority to continue with the adjudication of the contested portions of these permits, EPA would continue to administer the uncontested provisions of the permits it had already "issued," while DENCON would assume authority over the issuance of the contested remainder.

EPA has raised before this Court the specter of confusion, wasted effort and needless duplication which it claims would follow if we required it to suspend its issuance of permits under § 402(a)(1). The specter in the actual case before us is nothing more than that: a specter. While EPA may have made "preparations" for the adjudicatory hearing necessary before the permits can be issued, no evidentiary hearings have in fact been held yet, and only the most preliminary of proceedings have taken place. Here, as in many situations arising under the Act, coordination between state and federal authorities would go a long way towards obviating any such confusion. Indeed, such coordination has been described as "imperative." *See Pacific Legal Foundation v. Costle,* 586 F.2d 650 (9th Cir., decided August 9, 1978). In any event, Congress has spoken in the matter, and in performing its legislative function has already weighed the possibility of transitional inconvenience against the benefits of Home Rule.

> "Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

EPA's attempt to perpetuate its own authority in the matter by requiring a Memorandum of Agreement to that effect from the State of New York as a condition of approving the state program, and DENCON's willingness to comply with EPA's imposition in order to avoid facing what is obviously a very sensitive situation are both understandable. The scheme so concocted to regulate the transfer of power to the state is a rational one. It does not, however, present the procedure envisioned and required by Congress, and violates the intent of Congress to transfer power to the states, fully and promptly. Indeed, the majority does not rely on it. Any suggestion that the executive branch of New York State government lacks the will, the expertise or the resources to deal with these permits is on its face incredible, and not substantiated by competent evidence before the district court. In fact, long before the permits in this case could have been finally

adjudicated by EPA, with ultimate review in this Court, DENCON doubtless will have heard and decided applications for at least one and perhaps other similar permits for other generating stations presently planned for construction in the Hudson River Valley.[3] We thus will be confronted with exactly the piecemeal type of administration of the pollution problem in the river, which was rejected by Congress. The possibility of conflicting and different results is likely.

The majority recognizes, as indeed it must, the great importance of this entire question. As a nation, we are committed to the elimination of pollution of our national waterways in accordance with the highest available technology. Pendency of the thermal pollution issue has prevented solution of the lesser included problem of the fish kills, damaging valuable Hudson River fisheries by the present, temporary, once-through cooling systems.

The Hudson River Valley is a national treasure. It has been referred to as the Rhine of America. Our Court has written: "The highlands and gorge of the Hudson offer one of the finest pieces of river scenery in the world. The great German traveler Baedeker called it 'finer than the Rhine'." *Scenic Hudson Preservation Conference v. Federal Power Commission,* 354 F.2d 608 (2d Cir. 1965).

With the erection of the giant cooling towers described in this record, the Hudson River will no longer be the Rhine of America, but rather the Nile of America, with these towers substituting for pyramids, and having approximately the same relative size.[4] Appellants' plants are located where the river water is saline.[5] The cooling towers will release continuous heated water vapor carrying sublimated salt, to be precipitated later on the farms, orchards and homes in the Hudson Valley. The energy cost in operating the cooling towers is substantial and continuous, and the cost to electric rate payers has been duly noted by the majority.

If, in accordance with law, such burdens must be imposed upon the Hudson River Valley and its people, it should be done as Congress intended it to be done, after an adjudication by state government, rather than by remote administrators in Washington.

I would reverse the judgment of the district court and remand with instructions to enter summary judgment in favor of appellants granting declaratory relief and providing that jurisdiction over the contested conditions is vested in the Department of Environmental Conservation of the State of New York.

---

3. PASNY *intends to construct a new nuclear generating station at Cementon, New York.*

4. The Great Pyramid at Ghizeh on the Nile is 481 feet in height. The six cooling towers on the Hudson to be required here would be between 390 and 560 feet in height, comparable to a skyscraper 40 to 45 stories high, with an annual energy cost to operate equivalent to burning about 720,000 barrels of oil.

5. The Hudson River is a tidal estuary, having a mean tidal range of 4½ feet at Albany, New York. Depending on the tides, wind, and level of fresh water flow, the salt wedge intrudes from the ocean, sometimes as far as Poughkeepsie, New York, which lies 65 miles upstream from the Battery. Indian Point, Bowline Point and Roseton, locations of the generating stations, all lie downstream from Poughkeepsie.