**BETHLEHEM STEEL CORPORATION,**
**Petitioner,**

v.

**ENVIRONMENTAL PROTECTION**
**AGENCY et al., Respondents.**

No. 939, Docket 75–4119.

United States Court of Appeals,
Second Circuit.

Argued April 27, 1976.

Decided June 28, 1976.

David K. Floyd, Buffalo, N. Y. (Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y., on the brief), for petitioner.

Patrick A. Mulloy, Atty., Dept. of Justice, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen., Alfred T. Ghiorzi, Atty., Washington, D. C., on the brief), Steven Schatzow, Atty., E.P.A., Washington, D. C. (Robert V. Zener, Gen. Counsel, Washington, D. C., Warren H. Llewellyn, Atty., E.P.A., New York City, on the brief), for respondents.

Before LUMBARD, WATERMAN and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Bethlehem Steel Corporation petitions for review of the action of the Environmental Protection Agency (EPA) in partially approving New York State's revised water quality standards. 40 Fed.Reg. 13216 (March 25, 1975); 40 C.F.R. § 120.10. Bethlehem claims that this action was for various reasons inconsistent with the Federal Water Pollution Control Act (FWPCA) and should therefore be set aside. Respondents

EPA and its Administrator[1] dispute these contentions on the merits, and also argue that this court lacks jurisdiction to review this sort of agency action, and that Bethlehem's petition was not timely. We agree with EPA that we lack jurisdiction, and dismiss the petition for review.

I

The FWPCA, originally enacted in 1948, Pub.L. No. 80–845, 62 Stat. 1155, has been amended several times.[2] The most recent major statutory change, the Federal Water Pollution Act Amendments of 1972, Pub.L. No. 92–500, 86 Stat. 816, which was passed over President Nixon's veto, substantially revised, expanded and recodified the FWPCA. 33 U.S.C. § 1251 et seq. The present statute provides for a complex combination of state and federal regulation of water pollution.[3]

In this case, Bethlehem seeks review of EPA's action partially approving New York's thermal water quality standards pursuant to section 303 of the FWPCA. 33 U.S.C. § 1313. EPA contends that the courts of appeals lack jurisdiction over such a petition, because section 509(b)(1) of the FWPCA, 33 U.S.C. § 1369(b)(1),[4] which provides for review of certain actions of EPA, does not mention the approval or disapproval of state water quality standards pursuant to section 303 as one of the EPA actions that may be reviewed by courts of appeals.

In view of the specificity of the judicial review provision, this omission presents Bethlehem with considerable difficulty in establishing jurisdiction in this court. Bethlehem seeks to surmount this hurdle by relying on subdivision (E) of section 509(b)(1), see note 4 supra, which permits court of appeals review of EPA action "approving or promulgating any effluent limitation or other limitation under section 301, 302, or 306," and arguing that state water quality standards are limitations within the meaning of that clause.

The background and legislative history of the 1972 Amendments make this proposition dubious. The drafters of that statute drew a definite distinction between water quality standards and effluent limitations, and were unlikely to have confused the two, or used one term to include the other.

Title III of the FWPCA as amended in 1972 provides for two major types of regulation: "water quality standards" and "effluent limitations." The former controls are provided for in section 303 of the Act, 33 U.S.C. § 1313, and are the type of regulation at issue in this case. Water quality standards made their first appearance in the FWPCA through section 5 of the Water Quality Act of 1965, Pub.L. No. 89–234, 79 Stat. 903. Such standards, under the present Act,

shall consist of the designated uses of the navigable waters involved and the water

---

1. For convenience, we will refer throughout the opinion only to EPA.

2. See Note, Codification, following 33 U.S.C.A. § 1251; H.R.Rep. No. 92–911, 92d Cong., 2d Sess. 66–68 (1972), reported in 1 Environmental Policy Division of the Congressional Research Service of the Library of Congress, A Legislative History of the Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess. 753–55 (Comm. Print 1973) (hereafter "Legislative History").

3. See generally Note, The Federal Water Pollution Control Act Amendments of 1972, 14 B.C. Ind. & Com.L.Rev. 672 (1973), for a thorough discussion of the present statute and its predecessors.

4. This section provides:
Review of the Administrator's action (A) in promulgating any standard of performance under section 306, (B) in making any deter-

mination pursuant to section 306(b)(1)(C), (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 307, (D) in making any determination as to a State permit program submitted under section 402(b), (E) in approving or promulgating any effluent limitation or other limitation under section 301, 302, or 306, and (F) in issuing or denying any permit under section 402, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.

quality criteria for such waters based upon such uses.

33 U.S.C. § 1313(c)(2). Before the 1972 Amendments, water quality standards, as the Eighth Circuit has noted, were the "keystone" of the federal pollution control program. "Under that program, if wastes discharged into receiving waters reduced the quality below permissible standards, legal action could be commenced against the discharger." *CPC International Inc. v. Train*, 515 F.2d 1032, 1034–35 (8th Cir. 1975). See former 33 U.S.C. § 1160(c)(5), repealed by the 1972 Act. This system was subject to criticism for several reasons. Many critics argued that the water quality standards simply were not set high enough.[5] More important for our purposes, it was argued that enforcement was inadequate, both because the procedure was peculiarly cumbersome, and because the burden of proving that a particular polluter had caused the water quality to dip below the standards was all but impossible to satisfy.[6]

It was this dissatisfaction with water quality standards as a method of pollution control that led to the proposal that they be replaced or supplemented with "effluent limitations":

> The concept of effluent limitation has been offered as a logical alternative to the water quality standards. Instead of *indirectly* measuring discharges by their effect on water quality, monitoring equipment would *directly* measure discharges at their source.

Boston College Note, supra note 5, at 752. See also Statement of Hon. William D. Ruckelshaus, then Administrator of the Environmental Protection Agency, in Hearings on H.R. 11896, House Committee on Public Works (Dec. 7, 1972), reported in 2 Legislative History, supra note 2, at 1182–83. The 1972 Amendments to the FWPCA adopted this proposal, and

> changed the emphasis in the statutory scheme of water pollution control from that of regulating the quality standard of the body of water involved to regulating not only the quality standard of the body of water but also the quality of the effluent discharged into the body of water.

*E. I. du Pont de Nemours & Co. v. Train*, 528 F.2d 1136, 1137 (4th Cir. 1975), cert. granted, —— U.S. ——, 96 S.Ct. 1662, 48 L.Ed.2d 174, 44 U.S.L.W. 3592 (1976) (*du Pont I*). Effluent limitations are defined in section 502(11) of the FWPCA, 33 U.S.C. § 1362(11),[7] and are established pursuant to sections 301, 304 and 306, 33 U.S.C. §§ 1311, 1314, 1316.

Thus, although water quality standards and effluent limitations are related, see, e. g., sections 301(b)(1)(C) and 302, 33 U.S.C. §§ 1311(b)(1)(C), 1312, permitting effluent limitations to be based on water quality standards, the two are entirely different concepts and the difference is at the heart of the 1972 Amendments.

## II

Despite this history, Bethlehem argues that the structure of the Act demonstrates that in this instance "effluent limitation or other limitation under section 301, 302, or 306" includes water quality standards under section 303, and therefore jurisdiction over this action rests in this court.

Wisconsin Note, supra note 5, at 894–95; Boston College Note, supra note 5, at 752.

5. See, e. g., Note, The Federal Water Pollution Control Act Amendments of 1972, 1973 Wisc.L. Rev. 893, 894 ("Wisconsin Note"); Note, Federal Water Pollution Legislation: Current Proposals to Achieve More Effective Enforcement, 13 B.C.Ind. & Com.L.Rev. 749, 751–52 (1972) ("Boston College Note").

6. *CPC International Inc. v. Train*, 515 F.2d 1032, 1035 (8th Cir. 1975); S.Rep. No. 92–414, 92d Cong. 1st Sess. 5, reported in 2 Legislative History, supra note 2, at 1423, and at 2 U.S. Code Cong. & Admin.News, p. 3672 (1972);

7. This section provides:

> The term "effluent limitation" means any restriction established by a State or the Administrator on quanities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.

First, it contends that from sections 301(b)(1)(C) and 502(11) of the FWPCA, 33 U.S.C. §§ 1311(b)(1)(C), 1362(11), it is clear that "effluent limitations" include regulations promulgated by the states as well as by EPA. Indeed, citing the Eighth Circuit's decision in *CPC International Inc. v. Train*, supra, Bethlehem argues that *only* the states have authority to issue effluent limitations, and that section 301 does not authorize EPA to issue such limitations. If this view is accepted, Bethlehem argues, the inclusion in section 509(b)(1)(E), 33 U.S.C. § 1369(b)(1)(E), see note 4 supra, of "approving or promulgating any effluent limitation or other limitation under section 301" among EPA actions that may be reviewed in the courts of appeals would be meaningless unless water quality standards are considered "limitations," which arise "under section 301" because they are designed to meet the goals established in that section.

This argument is fallacious. We have rejected the Eighth Circuit's view of section 301, *Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620, 624–629 (2d Cir. 1976), as have other courts that have faced the issue. *E. I. du Pont de Nemours & Co. v. Train*, 541 F.2d 1018, 8 ERC 1718, 1720–22 (4th Cir. March 10, 1976), cert. granted, —— U.S. ——, 96 S.Ct. 3165, 48 L.Ed.2d ——, 44 U.S.L.W. 3738 (1976) (*du Pont II*); *American Meat Institute v. EPA*, 526 F.2d 442 (7th Cir. 1975); *American Iron & Steel Institute v. EPA*, 526 F.2d 1027 (3d Cir. 1975). If, as we have held, section 301 authorizes EPA to issue effluent limitations, the reference in section 509(b)(1)(E) is readily understandable. Although Bethlehem is correct that the Act does contemplate effluent limitations promulgated by the states, this does not mean that water

quality standards, because they are initially issued by the states, must therefore be regarded as effluent limitations. Moreover, even on the Eighth Circuit's view, the reference to section 301 is understandable without reference to section 303. *CPC International Inc. v. Train*, supra, 515 F.2d at 1043.

Second, Bethlehem argues that the use of the word "approving" in section 509(b)(1)(E) must refer to some action beyond the sections specifically enumerated, because EPA does not "approve" any limitations under any of those sections. The reference must therefore be to water quality standards, which are issued by the states and "approved" by EPA under section 303.

EPA replies that there are indeed actions that may be taken under sections 301, 302 and 306 that can be called "approval." [8] But we do not think it necessary to decide whether the actions specified by EPA were what Congress had in mind in using that word. The "approving or promulgating" language was used in the original Senate version of the 1972 Amendments, S. 2770, see 2 Legislative History, supra note 2, at 1713, and was taken over in the somewhat revised version of section 509 passed by the House, which eventually became law. The Senate bill, however, did not contain the section on water quality standards, section 303, which was added by the House. S.Conf.Rep. 92–1236, 92d Cong., 2d Sess., 122–24 (1972), reported in 1 Legislative History, supra note 2, at 305–07, and in 2 U.S.Code Cong. & Admin.News, pp. 3800–01 (1972). Thus, whatever the drafters intended to include in section 509(b)(1)(E) by using the word "approving," it cannot have been the approval of state water quality standards under section 303.[9]

---

**8.** EPA argues that the Administrator approves effluent limitations when he fails to revise existing limitations after the five-year review mandated by § 301(d), 33 U.S.C. § 1311(d); when he proposes to revise standards based on new technology under § 306(b)(1)(B), 33 U.S.C. § 1316(b)(1)(B), and then after public comment decides not to; and when a proposed water quality related effluent limitation under § 302, 33 U.S.C. § 1312, is not rejected after the hear-

ing provided in § 302(b). Brief for Respondents, at 18–20.

**9.** Nor can we assume that the omission of § 303 in § 509(b)(1)(E) is merely inadvertent. The House, in addition to inserting the present § 303 into the Senate bill, made changes in § 509, and the Conference Committee dealt with both sections. S.Conf.Rep. 92–1236, 92d Cong., 2d Sess. 122–24, 147–48 (1972), reported in 1 Legislative History, supra note 2, at 305–

Finally, Bethlehem argues that on policy grounds, its interpretation of the judicial review provision is preferable, because to interpret it otherwise would lead to bifurcated review of EPA actions under the FWPCA, with the courts of appeals reviewing effluent limitations, and the district courts reviewing actions taken in respect of section 303 water quality standards, under the Administrative Procedure Act, 5 U.S.C. § 703; *Rettinger v. FTC,* 392 F.2d 454 (2d Cir. 1968).[10] At least one court has indicated, in a slightly different context, a preference for centralizing review in the courts of appeals. *du Pont I,* supra, 528 F.2d at 1141–42.[11]

As the court in *du Pont I* pointed out, "there is little legislative history relating to § 509," and there is "no mention of any division of judicial review." Id. at 1141. Nevertheless, the complexity and specificity of section 509(b) in identifying what actions of EPA under the FWPCA would be reviewable in the courts of appeals suggests that not all such actions are so reviewable. If Congress had so intended, it could have simply provided that all EPA action under the statute would be subject to review in the courts of appeals, rather than specifying particular actions and leaving out others. Moreover, the division between review of water quality standards and review of effluent limitations is not as irrational as Bethlehem suggests. As EPA correctly points out, effluent limitations may have a national scope, and an immediate impact on large classes of dischargers. Prompt review in the courts of appeals may be more appropriate for such actions than for approval of state water quality standards, which apply only in a single state and have less direct effect on individual enterprises. In this case, for example, it is difficult to see on the record before us how Bethlehem is harmed by the EPA action in question. Prior district court proceedings may focus the issues more clearly.[12]

This distinguishes *du Pont I,* in which the Fourth Circuit was considering whether court of appeals review of effluent limitation regulations issued pursuant to both section 301 and section 304(b) of the FWPCA, 33 U.S.C. §§ 1311, 1314(b) was authorized by section 509. The court noted that other courts faced with such regulations had first decided whether section 301 empowered EPA to issue such regulations, and had then found jurisdiction to exist or not depending on whether the regulations were found to be authorized by that section. See *Hooker Chemicals & Plastics Corp. v. Train,* supra; *American Meat Institute v. EPA,* supra; *American Iron & Steel Institute v. EPA,* supra; *CPC International Inc. v. Train,* supra. Instead of adopting this approach, the court pointed out that even if section 301 itself did not authorize the regulations, section 304(b) surely did, and in any case the regulations were aimed at accomplishing the goals set by section 301. Furthermore, the regulations in issue established effluent limitations for existing point sources of pollution, while similar regulations for new point sources, issued under section 306, were expressly reviewable in

---

07, 330–31, and in 2 U.S.Code Cong. & Admin. News, pp. 3800–01, 3824–25 (1972). Under the circumstances, we cannot assume that Congress did not focus on judicial review when the water quality standards provisions were adopted.

**10.** EPA indicates in its brief that district court review of agency actions under § 303 is appropriate. Brief for Respondents, at 11, 21–23. We would be more skeptical of EPA's argument that we lack jurisdiction over Bethlehem's petition if EPA also argued that no court had jurisdiction to review such actions. The legislative history shows no intention to put any agency action under the FWPCA beyond judicial review. See S.Rep. 92–414, supra note

6, at 85, reported in 2 Legislative History, supra note 2, at 1503, and at 2 U.S.Code Cong. & Admin.News, p. 3750 (1972).

**11.** For a general discussion of the problems caused by lack of clarity in assigning jurisdiction to review administrative action, see Note, Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals, 88 Harv.L.Rev. 980 (1975).

**12.** We also note that before the 1972 Amendments, review of water quality standards under the FWPCA was in enforcement proceedings in a trial-level court. See former 33 U.S.C. § 1160(c)(5).

the courts of appeals under section 509(b)(1).[13] 528 F.2d at 1141–42. In those circumstances, where the regulations were clearly effluent limitations, were at least arguably authorized by section 301, and were parallel to other limitations which were clearly authorized by section 306 and thus reviewable in the courts of appeals, the court found it would be irrational to hold that those regulations were reviewable in the district court. Here, as we have shown, the regulations at issue are not effluent limitations and are sharply differentiated from section 301 and 306 limitations in the statutory scheme, and there is some rationale for a separate type of review.

### III

The jurisdictional question is a difficult one. Several courts, including this one, have commented previously on the jurisdictional and substantive problems presented by the FWPCA. *Hooker Chemicals & Plastics Corp.,* supra, at 625–627; *du Pont II,* supra, 541 F.2d 1018, 8 ERC at 1721; *American Iron & Steel Institute v. EPA,* supra, at 1074 (Adams, *J.,* concurring), 1036–37 & n. 14a. Moreover, Bethlehem has presented several troubling arguments. But it seems to us that when a jurisdictional statute sets forth with such specificity the actions of an administrative agency which may be reviewed in the courts of appeals, a litigant seeking such review of an action that is not specified bears a particularly heavy burden. Given the clear distinction in the legislative history of the statute between water quality standards and effluent limitations, Bethlehem's argument that inclusion of the latter in section 509(b)(1) must cover the former as well is unconvincing. While a statutory scheme that permits review of effluent limitation regulations in the courts of appeals but leaves review of approval of state water quality standards to the district courts under the Administrative Procedure Act seems odd, reasons for the division can be imagined, and the unusualness of the result does not sufficiently persuade us that section 509 does not mean what it says. Finally, we note that the Supreme Court has indicated that courts should hesitate before rejecting EPA interpretations of complex environmental legislation. *Train v. Natural Resources Defense Council,* 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

It would be too much to say that we construe this confusing statute with confidence. But construe it we must, consoled by the knowledge that if our interpretation of the intent of Congress is incorrect, Congress can easily correct it. In any event, we conclude that Congress did not intend EPA actions such as the one Bethlehem here challenges to be reviewed in the first instance in the courts of appeals.

Accordingly, the petition to review is dismissed for lack of jurisdiction.

---

**13.** The terms "source," "new source" and "point source" are defined in the FWPCA as follows:

> The term "new source" means any source, the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source, if such standard is thereafter promulgated in accordance with this section.
>
> The term "source" means any building, structure, facility, or installation from which there is or may be the discharge of pollutants.

33 U.S.C. §§ 1316(a)(2), (3).

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14).