**AMERICAN PAPER INSTITUTE, INC., James River–Norwalk, Inc., Nekoosa Packaging Corporation, Fort Howard Corporation, and Stone Container Corporation, Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

Nos. 88–1395, 88–1396.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1988.

Decided Aug. 1, 1989.

Revised Nov. 27, 1989.*

* The original opinion in this case was issued on August 1, 1989. This revised opinion is issued in light of matters raised in the petitioners' petition for rehearing and suggestion for rehearing *en banc*.

On consideration of the petitioners' petition for rehearing and suggestion for rehearing *en banc*, no judge in active service having requested a vote thereon, and all of the judges on the original panel having voted to deny rehearing, it is ordered that the aforesaid petition be, and the same is hereby, denied.

Charles Kamps, Nancy K. Peterson, Quarles & Brady, Milwaukee, Wis., Russell S. Frye, Chris Montgomery, Chadbourne & Parke, Washington, D.C., David E. Evans, McGuire, Woods, Battle & Boothe, Richmond, Va., Jill A. Well, Smith & Schnacke, Cincinnati, Ohio, for petitioners.

Steven Neugeboren, E.P.A., Washington, D.C., Gary S. Guzy, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for respondent.

Before WOOD, Jr., and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.**

American Paper Institute (API) and four paper and pulp mill owners challenge the federal Environmental Protection Agency's (EPA's) authority to object to permits proposed by the Wisconsin Department of Natural Resources (WDNR) and to promulgate antidegradation regulations under the water pollution control statute, 33 U.S.C. §§ 1251–1376. The EPA claims that this court lacks subject matter jurisdiction to review API's claims. It argues in the alternative that the claims are not ripe for review. We agree with the EPA that we lack subject matter jurisdiction to hear either of API's claims and do not reach either the question of ripeness or the substantive merits of API's appeal. We therefore dismiss API's petition.

## I. BACKGROUND

A. *Structure of the Clean Water Act*

Disturbed over the ineffectiveness of existing water pollution control, Congress restructured the Federal Water Pollution Control Act (FWPCA) in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In the 1972 amendments, Congress specifically outlined its goals: to have "fishable and swimmable" waters by 1983 and to eliminate all pollutant discharges into navigable waters by 1985. In 1977 Congress amended the stat-

---

** Judge Fairchild contributed to this amended opinion through the thoughts and ideas in his original concurrence.

ute again through the Clean Water Act but did not change the primary structure of the program implemented in 1972.

Under the Act,[1] the primary means of imposing water pollution control on dischargers or "point sources" is a permit system called the National Pollutant Discharge Elimination System (NPDES). Each point source must obtain a NPDES permit before it may emit identified pollutants into American waters. The NPDES permit restricts the quantity, rate, and concentration of pollutants that the point source may emit into the water and provides a schedule for compliance with the water quality standards and effluent limitations applicable to that point source. Any discharge without a NPDES permit is illegal. 33 U.S.C. § 1311(a).

The EPA administers the NPDES program in each state unless the EPA previously authorized a state program to issue NPDES permits. 33 U.S.C. § 1342(b). Thirty-nine states presently have their own permit-issuing programs over which the EPA retains oversight authority. In states with permit programs, the state proposes the NPDES permit it intends to issue to a point source and the EPA has ninety days to object to the permit. The EPA may object if it finds that the state ignored recommendations from another state whose waters could be affected by the emissions from the point source or that the permit is "outside the guidelines and requirements" of the Act. 33 U.S.C. § 1342(d)(2). If the EPA objects, it provides a comment period, and a public hearing when requested by the state or interested parties. 40 C.F.R. § 123.44(e) (1988). The EPA then must modify, withdraw, or reaffirm its objections. 40 C.F.R. § 123.44(g) (1988).

If the EPA reaffirms its objections, the state and the EPA may proceed in either of two ways. The state may modify the terms of its proposed permit within thirty days of EPA's decision to stand by its objections.[2] If the state agrees to modify the permit, it must again allow a comment period before issuing the permit. If the state refuses to modify the proposed permit, the EPA may assume exclusive authority to issue the permit. 33 U.S.C. § 1342(d)(1) & (4). Before the EPA can issue its own permit, however, it must again propose a version of the permit, allow a comment period and possibly conduct a hearing. 40 C.F.R. §§ 124.6, 124.10, 124.12 (1988). Prior to the 1977 amendments, the EPA was not authorized to resolve the impasse in this fashion. Before 1977 the EPA could veto a permit proposed by the state but had no authority to issue a federal permit if the state refused to meet the EPA's objections. No permit would issue under FWPCA if the state and the EPA did not agree on the terms of the permit.

In addition to its duties under the NPDES program, the EPA must develop and oversee state promulgation of water quality standards for the waters of the United States. 33 U.S.C. § 1313(c). In accordance with its interpretation of this authority, the EPA has created an antidegradation policy, which requires the states to promulgate antidegradation plans. Under the antidegradation policy outlined in EPA regulations, 40 C.F.R. § 131.12 (1988), the individual states must design antidegradation plans that address how the state will maintain existing water quality once a desired water quality standard is reached. The EPA antidegradation policy stipulates the following standards: at a minimum, the states must devise antidegradation plans that maintain existing water quality if the water quality is below the "fishable and swimmable" goal. Where "fishable and swimmable" water quality has been reached, the state can reduce water quality only if "an important social and economic development" in the area in which the wa-

---

1. For the sake of clarity, we will refer to the water pollution control statute in its current form, 33 U.S.C. §§ 1251–1376 as "the Act" unless we need to distinguish between the pre–1977 and post–1977 versions of the statute, in which case we will use the respective terms Federal Water Pollution Control Act (or FWPCA) and Clean Water Act.

2. The state has ninety days to modify its proposed permit if no hearing is held. 33 U.S.C. § 1342(d)(4).

ters are located justifies the reduction. The state must prevent water constituting an "outstanding national resource" from being degraded. Finally and more specifically, the state may relax stringent limitations on thermal pollution of certain conditions are met.

## B. *The Present Challenge*

The EPA, in February 1974, authorized WDNR to issue permits to point sources in Wisconsin. Pursuant to that authority, WDNR proposed to issue thirteen permits to paper and pulp mills in Wisconsin.

On September 10, 1986, the EPA notified WDNR that it objected to the thirteen permits that WDNR had proposed. The EPA spelled out its objections more specifically on November 28, 1986, allowed comments on the objections, and, at the request of WDNR and other interested parties, provided a public hearing on the objections. In response to comments made, the EPA modified some of its objections, but on November 4, 1987, the EPA reaffirmed its remaining objections with regard to eleven of the permits.[3] The EPA stated that the eleven proposed permits failed to properly monitor and limit the discharge of toxic pollutants as required by federal and state law and five of the eleven permits violated federal and state antidegradation policies. The EPA gave WDNR thirty days to modify the permits.

On December 3, 1987, WDNR modified the permits to meet the EPA's objections. American Paper Institute and four paper and pulp mill owners petitioned this court to review the EPA objections and the antidegradation policy supporting the objections. For the sake of clarity we will refer

to all petitioners as American Paper Institute or API.[4]

## II.  DISCUSSION

American Paper Institute challenges the EPA's authority to object to the WDNR-proposed permits. API contends that the EPA exceeded its authority when it objected to proposed permits that, API argues, were within the guidelines and requirements of the Act. Furthermore, API claims that nowhere in the Act is the EPA authorized to promulgate an antidegradation policy for the states.

Arguing a lack of subject matter jurisdiction, the EPA asserts that the merits of API's claims are not reviewable in this court. The EPA contends that its actions are not reviewable because 33 U.S.C. § 1369(b)(1), the provision of the Act granting the federal court of appeals subject matter jurisdiction over a limited set of EPA actions, does not cover the actions challenged by API. The EPA also claims that the issues raised by API are moot because the state has agreed to the terms of the EPA's objections and issued modified permits. Finally, the EPA argues that the doctrine of ripeness precludes our review.

Because we find that we lack subject matter jurisdiction to hear this appeal, we do not reach any of the EPA's or API's other arguments.

## A. *The EPA Objections to the State-proposed Permits*

When the EPA objected to the permits proposed by WDNR, American Paper Institute asserts that, in effect, the EPA "denied a permit" within the meaning of 33 U.S.C. § 1369(b)(1)(F).[5] Under that stat-

---

**3.** In response to EPA objections, WDNR revised the permits it proposed for the Neenah Paper Company and the City of Appleton; based on those revisions, the EPA withdrew its objections to both permits. Neither permit is a subject of this appeal.

**4.** American Paper Institute is a trade association, some of whose members requested the permits. Trade associations have standing to bring legal challenges on behalf of their members. *Hunt v. Washington State Apple Advertis-*

*ing Comm'n*, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2440–41, 53 L.Ed.2d 383 (1977). The EPA does not challenge API's standing to bring this action.

**5.** Review of the [EPA] Administrator's action ... (F) in issuing or *denying any permit* under section 1342 of this title ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action....

ute, this court has jurisdiction to review EPA "denials" of permits. API argues that subsection 1369(b)(1)(F) applies to permits in both their proposed and final forms. According to API, the objections were "denials" because the EPA gave WDNR no choice but to accept the EPA objections if WDNR wanted to retain control over the permit program. Following the Supreme Court's practical approach to jurisdiction under subsection 1369(b)(1), *see Crown Simpson Pulp Co. v. Costle,* 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980); *Natural Resources Defense Council v. EPA,* 656 F.2d 768, 776 (D.C.Cir.1981), we hold that we lack jurisdiction to review the EPA's objections.

The Third Circuit has advocated a liberal interpretation of subsection 1369(b)(1). *See Modine Mfg. Corp. v. Kay,* 791 F.2d 267, 269–71 (3d Cir.1986). It noted that the Supreme Court has encouraged liberal interpretation of statutory provisions providing judicial review and appellate review of administrative cases. *Id.* at 269–70. On the other hand, because of the specificity and complexity of subsection 1369(b)(1), the Second Circuit has urged a more restrictive reading. *See Central Hudson Gas & Elec. Corp. v. EPA,* 587 F.2d 549, 555–56 (2d Cir.1978); *Bethlehem Steel Corp. v. EPA,* 538 F.2d 513, 517 (2d Cir.1976) ("Nevertheless, the complexity and specificity of section [1369(b)(1)] in identifying what actions of EPA under the FWPCA would be reviewable in the courts of appeals suggests

that not all such actions are so reviewable.").

In the circumstances of this case, we must eschew the traditional benchmarks of statutory construction and turn toward the practical task of filling a vacuum of jurisdiction within the NPDES system. While we would prefer congressional guidance, this case forces us to fashion a scheme of judicial redress for state NPDES permits issued after EPA objection.

Both the FWPCA and the Clean Water Act evince a strong congressional intent to make the states, where possible, the primary regulators of the NPDES system. The statute itself declares:

> It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b). The legislative history is replete with statements recognizing that the states should play the leading role in implementing the NPDES system.[6] In addition, numerous courts have recognized "the primacy of state and local enforcement of water pollution controls [as] a theme that resounds throughout the history" of the Act. *Save the Bay, Inc. v. Administrator of the EPA,* 556 F.2d 1282, 1294 (5th Cir.1977); *accord District of Co-*

---

33 U.S.C. § 1369(b)(1)(F) (emphasis added).

**6.** *See, e.g.,* S.Rep. No. 414, 92d Cong., 1st Sess. 71 (1971), U.S.Code Cong. & Admin.News 1972, p. 3668. ("It is expected that the States will play a major role in the administration of this program (NPDES)."), *reprinted in* 2 *Legislative History of the Water Pollution Control Act Amendments of 1972,* at 1415, 1489 (1973) [hereinafter *FWPCA History*]; H.R.Rep. No. 911, 92d Cong., 2d Sess. 127 (1972) ("The Committee believes that the States ought to have the opportunity to assume the responsibilities that they have requested."), *reprinted in* 1 *FWPCA History* 753, 814; Staff Memo of Subcomm. on Investigations and Review, Comm. on Public Works and Transp., *reprinted in* 3 *A Legislative History of the Clean Water Act of 1977,* at 346 (1977) ("This process for approval of State permitting programs was included in the act to continue the

primary State role in water pollution control. . . .") [hereinafter *Clean Water Act History*]; 123 Cong.Rec. 39,209 (1977) (remarks of Sen. Baker) ("The conferees believe that the State permit programs will continue to afford the best protection from potentially harmful discharges. . . ."), *reprinted in* 3 *Clean Water Act History* 524; 2569 Cong.Rec. 10,206 (1972) (remarks of Rep. Harsha) ("Unless we have meaningful local and State participation and not a Federal dictatorship, the program will founder on the rocks of the generally inflexible."), *reprinted in* 1 *FWPCA History* at 355–56; 2569 Cong.Rec. 10,209 (1972) (remarks of Rep. Kluczynski) ("The States must play a prominent part in making the water pollution law work."), *reprinted in* 1 *FWPCA History* 363.

lumbia v. Schramm, 631 F.2d 854, 857 (D.C.Cir.1980); Shell Oil Co. v. Train, 585 F.2d 408, 410 (9th Cir.1978). Therefore, it seems beyond argument that we should construe the Act to place maximum responsibility for permitting decisions on the states where the EPA has certified a NPDES permitting program.

Appropriately, the courts have generally denied federal judicial review of state-issued permits. See, e.g., District of Columbia v. Schramm, 631 F.2d 854 (D.C.Cir. 1980); Shell Oil Co. v. Train, 585 F.2d 408 (9th Cir.1978); Consolidated Edison Co. v. New York State Dep't of Envtl. Conservation, No. 88 Civ. 3748 (LLS), 1989 WL 85848 (S.D.N.Y. July 26, 1989) (available at 1989 U.S.Dist.LEXIS 8464); Natural Resources Defense Council v. Outboard Marine Corp., 702 F.Supp. 690 (N.D.Ill.1988). For us to find jurisdiction to review the state permits in this case would mean that Congress intended a most improbable and awkward division of the review of state-issued permits between state and federal tribunals. See Chesapeake Bay Found. v. Virginia State Water Control Bd., 495 F.Supp. 1229, 1237 (E.D.Va.1980) ("It thus appears that Congress reserved unto the states the reviewability of state agency permitting decisions.").

In Crown Simpson Pulp Co. v. Costle, 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980), the Supreme Court held that EPA objection to a proposed state permit constituted a "denial" for purposes of 33 U.S.C. § 1369(b)(1)(F), giving the federal courts of appeals jurisdiction to review EPA objections. However, we believe that the Clean Water Act amendments to the FWPCA

fundamentally altered the underpinnings of the Crown Simpson decision.[7]

The Crown Simpson opinion emphasized the practical aspect of its decision. Natural Resources Defense Council v. EPA, 673 F.2d 400, 405 (D.C.Cir.), cert. denied, 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982); Natural Resources Defense Council v. EPA, 656 F.2d 768, 776 (D.C.Cir. 1981). Under the old system, an EPA objection effectively denied a permit because the objection created an impasse if the state refused to modify its proposed permit. Crown v. Simpson, 445 U.S. at 196, 100 S.Ct. at 1094 (EPA objection "functionally similar" to denying a proposed permit). In contrast, the 1977 Clean Water Act amendments now resolve the impasse by allowing the EPA to issue a permit if the state refuses to modify its proposed permit. 33 U.S.C. § 1342(d). Thus, an EPA objection to a proposed state permit is no longer "functionally similar" to denying a permit.

The Crown Simpson Court was most concerned with not creating a system of bifurcated review where federal district courts would review EPA objections to state-issued permits and federal appeals courts would review EPA issuance and denials of its own permits. See Crown Simpson, 445 U.S. at 197, 100 S.Ct. at 1095. In keeping with the rationale behind Crown Simpson, we too are concerned with not creating a system of bifurcated review. Unlike Crown Simpson, our concern stems not from a possible split in review between federal district and appellate courts, but rather from a split in the review of state-issued permits between state and federal courts.[8] To avoid this

---

**7.** The challenge brought in Crown Simpson preceded the 1977 amendments to FWPCA which empowered the EPA to issue its own permit if the state refused to modify its proposed permit. The Supreme Court, however, reviewed the challenge after FWPCA was amended. Because the law applicable to the Crown Simpson challenge did not include the Clean Water Act amendment of 1977, the Supreme Court declined to "consider the impact, if any, of this amendment on the jurisdictional issue presented...." 445 U.S. at 194 n. 2, 100 S.Ct. at 1093 n. 2.

**8.** We do not believe that our decision will lead to challenges of EPA objections in federal dis-

trict courts under an implied statutory cause of action. It is true that district courts would most likely have the power to hear such a challenge under the general federal question jurisdiction of 28 U.S.C. § 1331. See District of Columbia v. Schramm, 631 F.2d 854, 859 n. 10, 863 n. 15 (D.C.Cir.1980); Central Hudson Gas & Elec. Corp. v. EPA, 587 F.2d 549, 555 (2d Cir.1978). But see Natural Resources Defense Council v. EPA, 673 F.2d 400, 402 n. 4, 404 n. 14 (D.C.Cir.), cert. denied, 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982); Currie, Judicial Review Under Federal Pollution Laws, 62 Iowa L.Rev. 1221, 1227–28 (1978). Nevertheless, the question of whether a federal district court has jurisdiction

division of jurisdiction, we cannot allow subsection 1369(b)(1)(F) to provide us with the power to review the EPA's objections.

Were it not for the strong congressional scheme of state water pollution regulation, EPA objections to state permits could arguably be challenged in district court under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (APA).[9] If such review were available, it would create an undesired bifurcated system whereby both state and federal district courts would hear challenges to state NPDES permits issued after EPA objection. The APA, however, cuts off review of administrative actions to the extent that a statute precludes judicial review or that agency action is committed to agency discretion. 5 U.S.C. § 701. We find both exceptions to be applicable to this case.

To cut off access to judicial review, a contrary legislative intent must be shown by clear and convincing evidence. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). As discussed before, Congress spread across the record clear and convincing evidence of legislative intent to preclude federal review of state-issued permits. Furthermore, the Act reflects "the desire of Congress to put the regulatory burden on the states and to give the [EPA] broad discretion in administering the program." *District of Columbia v. Schramm,* 631 F.2d 854, 860 (D.C.Cir. 1980). The Act demonstrates an intent for the EPA and the states to work through differences in permitting decisions, and the EPA needs a range of discretion to accomplish this goal. The federal courts should leave EPA with its discretion to review state-issued permits.

Having decided that the Act does not contemplate federal court review of state-issued permits, it is necessary to comment on the state court's role in this statutory scheme. When reviewing state-issued permits, state courts may examine challenges to any pertinent EPA objections. Because an EPA objection causes a state permit to issue in other than its proposed form, the propriety of an EPA objection might often be at issue when reviewing a state-issued permit. The state courts are perfectly competent to decide questions of federal law. *See Younger v. Harris,* 401 U.S. 37, 52–53, 91 S.Ct. 746, 754–55, 27 L.Ed.2d 669 (1971). Ultimately, review in the United States Supreme Court by way of certiorari will help ensure that the state courts faithfully interpret the Act.[10]

B. *The EPA's Antidegradation Policy*

■ American Paper Institute also asks this court to review the EPA's promulgation of an antidegradation policy, 40 C.F.R. § 131.12 (1988), and the EPA Region V's interpretation of the antidegradation policy, EPA Region V Antidegradation Guidance, Dec. 3, 1986 (Petitioners' Brief, Appendix Vol. I, at 83). The EPA claims that these actions are not reviewable under 33 U.S.C. § 1369(b)(1)(E), but even if they are, they are time-barred.[11]

---

to hear a claim "is a concept quite apart from the issue of whether the plaintiffs have a cause of action to assert." *Chesapeake Bay Found. v. Virginia State Water Control Bd.,* 501 F.Supp. 821, 823 (E.D.Va.1980); *accord Consolidated Edison Co. v. New York State Dep't of Envtl. Conservation,* 88 Civ. 3748 (LLS) 1989 WL 85848 (S.D.N.Y. July 26, 1989) (available at 1989 U.S. Dist.LEXIS 8464). Precedent strongly suggests that there is no general implied private cause of action to challenge EPA objections under the Act. *See, e.g., Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 11–21, 101 S.Ct. 2615, 2621–27, 69 L.Ed.2d 435 (1981); *Schramm,* 631 F.2d at 862–64; *Consolidated Edison Co.,* 88 Civ. 3748 (LLS); *Chesapeake Bay Found.,* 495 F.Supp. at 1234–38.

**9.** A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702.

**10.** The EPA also has the authority to withdraw approval of state NPDES programs. 33 U.S.C. § 1342(c). Using this power, the EPA can also help to align state court action with the national goals and policies of the Act.

**11.** The EPA argues that API must have brought the claim within 120 days of the promulgation of the antidegradation statute in order to obtain relief under section 1369(b)(1). Because we hold that we do not have subject matter jurisdiction, we do not reach the merits of this argument.

API argues that subsection 1369(b)(1)(E) provides us with jurisdiction to examine the EPA's antidegradation policy and the regional office's interpretation of the policy. Subsection (b)(1)(E) states:

> Review of the Administrator's action ... (E) *in approving or promulgating any effluent limitation or other limitation* under section 1311, 1312, 1316, or 1345 ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business.

33 U.S.C. § 1369(b)(1)(E) (emphasis added). The EPA disagrees with API's characterization of the antidegradation policy as "effluent limitations or other limitations," contending that the antidegradation policy and the regional interpretation of the policy are water quality standards or (even more remotely) guidelines for creating water quality standards.

Congress did not explicitly provide for an antidegradation policy in the Act [12] but defined effluent limitations in section 1362 as

> [A]ny restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.

33 U.S.C. § 1362(11).

When examining whether an EPA regulation is an "effluent limitation or other limitation" for purposes of subsection 1369(b)(1)(E), other courts have considered the specificity of the regulation, the persons to whom the regulation is directed, and the effect of the regulation on point sources. *See, e.g., Natural Resources Defense Council v. EPA,* 656 F.2d 768, 775–76 (D.C.Cir.1981); *American Iron & Steel Inst. v. EPA,* 543 F.2d 521, 527 (3d. Cir. 1976). As a rule of thumb, effluent limitations dictate in specific and technical terms the amount of each pollutant that a point source may emit. *Montgomery Envtl. Coalition v. Costle,* 646 F.2d 568, 574 (D.C. Cir.1980). Effluent limitations describe the *measures* needed to implement the criteria defined in the water quality standards. *Cf. Trustees for Alaska v. EPA,* 749 F.2d 549, 557 (9th Cir.1984) ("Effluent limitations are a means of *achieving* water quality standards.").

The Court of Appeals for the District of Columbia Circuit interprets the term "effluent limitation or other limitation" as used in subsection 1369(b)(1)(E) to include more than numerical limitations. The D.C. Circuit held that Consolidated Permit Regulations (CPRs) were limitations within the meaning of subsection 1369(b)(1)(E). *National Resources Defense Council v. EPA,* 673 F.2d 400, 403–06 (D.C.Cir.), *cert. denied,* 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982). The court, in expansive language, acknowledged that CPRs did not contain the specific, technical language of effluent limitations and were more policy-oriented. *Id.* at 405. It held, however, that the CPRs were reviewable under subsection 1369(b)(1)(E) because policy-oriented regulations were better addressed in appellate court and the Supreme Court favored a broad interpretation of section 1369(b)(1). *Id.* Likewise, the D.C. Circuit has also held that regulations that allowed municipalities to apply for variances from the normal requirements of secondary treatment were reviewable under subsection 1369(b)(1)(E) as "effluent limitations." *See Natural Resources Defense Council,* 656 F.2d at 775.

API urges that we take an expansive approach, like that of the D.C. Circuit, and find jurisdiction because the antidegradation policy and regional office's interpretation place some restrictions on the effluents that may be emitted by a point source. If we accepted API's position, we would in effect allow the term "other limitation" to swallow up distinctions that Congress made between effluent limitations

---

12. EPA contends that it promulgated the antidegradation policy under 33 U.S.C. § 1313, the statutory provision for water quality standards and implementation plans. Because we do not have jurisdiction under subsection 1369(b)(1)(E) to review the substantive claim, we will not address whether the EPA has correctly interpreted its authority under the statute.

and other types of EPA regulations. Water quality standards would be arguably reviewable as effluent limitations—a position that we reject. *Bethlehem Steel Corp. v. EPA*, 538 F.2d 513, 514–15 (2d Cir.1976); *cf. Trustees for Alaska*, 749 F.2d at 557. Congress could easily have provided jurisdiction for all types of restrictions on point sources by providing a general jurisdiction provision in the Act. *See Bethlehem Steel*, 538 F.2d at 517. Instead, Congress specified those EPA activities that were directly reviewable by the court of appeals. We interpret the "other limitation" language of subsection 1369(b)(1)(E) as restricted to limitations directly related to effluent limitations.

This approach is not inconsistent with the D.C. Circuit's decisions. While the regulations before the D.C. Circuit implemented policy, they also were highly specific and detailed provisions that directed the point sources to engage in specific types of activity. The CPRs, for example, dictate who must apply for a permit and when, the information that must be contained in a NPDES permit, the application requirements for existing point sources and for new sources, and other highly specific information. *See* 40 C.F.R. pts. 122–125 (1988).

In comparison, the antidegradation regulation and regional office's interpretation letter provide a general outline of the EPA's policy for maintaining existing water quality.[13] The antidegradation regulation and regional office's interpretation letter require the state to maintain a water quality standard once that standard has been reached. They also allow the state to permit a point source to emit a greater amount of effluent if the point source can prove that the change is necessary for economic development and that the water quality will not dip below the standard previously achieved. Like a water quality standard, the antidegradation regulation and regional office's letter dictate the type of uses and water quality criteria for the navigable water. *See* 33 U.S.C. § 1313(c)(2). Unlike an effluent limitation, the antidegradation regulation and regional office letter do not limit the permissible amount of discharge but establish criteria for increasing the amount that a point source may emit.

The antidegradation regulation and regional office letter set policy to be applied to all point sources. They speak in general terms and do not specify what type of proof is needed, the methods to be employed to measure water quality, or the type of economic development that is considered necessary. The EPA addressed its antidegradation regulation and the regional office letter to the states and not to the point sources. *See Commonwealth Edison Co. v. Train*, 649 F.2d 481, 484 (7th Cir.1980). Furthermore, the antidegrada-

---

**13.** The antidegradation regulation as issued by the EPA states:

(a) The State shall develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy pursuant to this subpart. The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following:

(1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.

(2) Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control.

(3) Where high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected.

(4) In those cases where potential water quality impairment associated with a thermal discharge is involved, the antidegradation policy and implementing method shall be consistent with section 316 of the Act.

40 C.F.R. § 131.12 (1988).

tion regulation is written in terms of policy and indicates the EPA's goals with regard to maintaining existing water quality. These factors indicate that the antidegradation regulation and regional office letter are not effluent limitations or guidelines for implementing effluent limitations. They therefore do not come within the jurisdiction of the appellate court under 33 U.S.C. § 1369(b)(1)(E).

### III. CONCLUSION

We therefore find that 33 U.S.C. § 1369(b)(1)(E)–(F) does not give this court subject matter jurisdiction to hear this appeal. Because we lack jurisdiction, we dismiss API's petition for review.